UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

KERRY HEICHELBECH,                )
(Social Security No. XXX-XX-5692),  )
                                   )
          Plaintiff,               )
                                   )
     v.                            )          3:10-cv-65-WGH-RLY
                                   )
MICHAEL J. ASTRUE, Commissioner    )
of the Social Security Administration, )
                                   )
          Defendant.               )


## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United

States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 7,

25) and an Order of Reference entered by Chief Judge Richard L. Young on

March 3, 2011 (Docket No. 29).


## I.  Statement of the Case

Plaintiff, Kerry Heichelbech, seeks judicial review of the final decision of

the agency, which found him not disabled and, therefore, not entitled to

Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI")

under the Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d), 1381; 20

C.F.R. § 404.1520(f).  This court has jurisdiction over this action pursuant to 42

U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff applied for DIB on August 8, 2007, and SSI on October 15, 2008, alleging disability since either July 16 or 24, 2007. (R. 89-96, 98-102). The agency denied Plaintiff's applications both initially and on reconsideration. (R. 46-51, 55-61). Plaintiff appeared and testified at a hearing before Administrative Law Judge Arline Colon ("ALJ") on August 7, 2009. (R. 21-45). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 21). On September 28, 2009, the ALJ issued her opinion finding that Plaintiff was not disabled because he retained the residual functional capacity ("RFC") to perform a significant number of jobs in the economy. (R. 10-20). After Plaintiff filed a request for review, the Appeals Council denied Plaintiff's request, leaving the ALJ's decision as the final decision of the Commissioner. (R. 1-4). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on May 4, 2010, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Plaintiff was 49 years old at the time of the ALJ's decision and had a high school education. (R. 19). His past relevant work experience included work as a material handler (heavy, semi-skilled), furniture repairer (medium, skilled), process operator (medium, semi-skilled), security guard (light, semi-skilled), and security guard supervisor (light, skilled). (R. 41).

**B. Medical Evidence**

    **1. Breathing Problems**

On December 14, 2005, Plaintiff was admitted to Memorial Hospital secondary to respiratory failure. (R. 187-89). He reported that he experienced shortness of breath that gradually worsened; he was working around a lot of lacquers and stains and eventually began coughing and could no longer get his breath. (R. 188). Plaintiff had a history of asthma, but had no problems for the prior five to ten years and had not used an inhaler during that time. (R. 188). Plaintiff reported being a one pack per month smoker. (R. 188). After being admitted, he was put on BiPAP treatment, which he tolerated well. (R. 187). The following day he was doing well on oxygen and prescribed Prednisone. By December 16, 2006, Plaintiff was found stable for discharge. (R. 187). His diagnosis was acute exacerbation of asthma. (R. 189). Plaintiff's discharge medications included Synthroid, Humalog, Humulin, Xopenex, Prednisone, and Keflex. (R. 187).

Plaintiff subsequently started treatment with Gregory Pfister, M.D., at the Memorial Health Care Center on December 28, 2005, for diagnoses of asthma, diabetes, and hypothyroidism. (R. 198).

On July 16, 2007, Plaintiff was admitted to Memorial Hospital with complaints of shortness of breath. (R. 185-86, 205). Plaintiff reported that his symptoms had gradually worsened over the past two weeks. (R. 185). It was noted that Plaintiff was a one pack a month smoker. (R. 185). He also reported

keeping active at work. (R. 186). Throughout his hospital stay, Plaintiff suffered from significant chest pain that was eventually attributed to his excessive coughing. (R. 205). He was started on Solu-Medrol and Levaquin and gradually improved. (R. 205). It was noted that Plaintiff began walking through the halls of the hospital three times a day. (R. 205). Plaintiff was then switched to Prednisone. He remained hospitalized through July 19, when he was stable for discharge; his lungs were clear, and he was up walking the halls and doing fairly well. (R. 205). Dr. Pfister diagnosed asthma exacerbation and prescribed Levaquin, Prednisone, Humulin, Actos, and Albuterol. (R. 205).

Dr. Pfister evaluated Plaintiff at a follow-up on July 23, 2007. He complained of worse breathing after he tried to return to his work which involved lacquer and stain fumes. An examination noted diminished breath sounds bilaterally. Dr. Pfister advised him to remain off work and have pulmonary function testing. (R. 219). Pulmonary function tests performed on July 25, 2007, indicated that Plaintiff had shortness of breath after exposure to hydrogen sulfide; Plaintiff also had a past history of smoking. Testing revealed the FVC and $FEV_1$ were both above 90 percent of the predicted value; assessment was possible early obstructive pulmonary disease with improvement after bronchodilator. (R. 193).

On July 30, 2007, Plaintiff stated that he recently became very short of breath when he smelled some fumes from the fingernail department while at Wal-Mart. (R. 219). Plaintiff's symptoms were exacerbated when he entered the

lacquer room at his work. Dr. Pfister's examination noted diminished breath sounds. He recommended that Plaintiff remain off work another two weeks and have a stress test. (R. 219). Plaintiff underwent a cardiac stress test on August 7, 2007, in which he experienced extreme shortness of breath by the completion of the test, but was otherwise normal. (R. 206).

On August 20, 2007, Plaintiff reported that his blood sugars were running somewhat high, although his shortness of breath was nearly completely resolved. Dr. Pfister stated that he could return to work if he was not around significant fumes. (R. 219).

However, only four days later, on August 24, 2007, Plaintiff was readmitted to the hospital with severe shortness of breath and started on Solu-Medrol and nebulizer treatments. (R. 368-73). Plaintiff had returned to his work where they placed him in the chemical storage room to clean it out. (R. 372). He remained an inpatient through August 27, 2007, when he was found stable for discharge. (R. 368). Dr. Pfister diagnosed asthma exacerbation, fever, and uncontrolled diabetes. The doctor opined that Plaintiff needed to stop work again. (R. 368).

On September 7, 2007, Plaintiff stated that his shortness of breath was better if he didn't do too much. (R. 421).

However, only a few days later, on September 10, 2007, Plaintiff was again admitted to Memorial Hospital because of severe shortness of breath. (R. 322-23). Plaintiff was at a funeral, had not had a nebulizer treatment in several

hours, and it was hot and muggy; it was noted that his shortness of breath was at least partially due to anxiety at that time. (R. 322). Plaintiff continued to work, but he had been off for about a month. (R. 322). Dr. Pfister diagnosed likely anxiety attack that brought on a mild asthma exacerbation. (R. 323). Plaintiff was treated overnight and discharged. (R. 322).

On September 27, 2007, Plaintiff started treating at St. Mary's Pulmonary Care with Victor Chavez, M.D. (R. 380-81). Plaintiff was a two pack a day smoker for 30 years who had reportedly quit smoking in August 2007. (R. 380). He complained of shortness of breath at rest and with activity and wheezing. He also reported excessive daytime sleepiness, trouble sleeping, and loud snoring. (R. 380). Dr. Chavez observed that Plaintiff was obese (he was 74 inches tall and weighed 321 pounds), in no acute distress, and very drowsy. (R. 381). Pulmonary function testing was essentially normal. Dr. Chavez diagnosed asthma and possible obstructive sleep apnea. He was to continue Symbicort and have a sleep study. (R. 381).

Notes from an October 8, 2007, doctor's visit indicated that Plaintiff's breathing was doing better; he reported making it six holes of golf on a cart before he had to quit his round. (R. 421).

On November 8, 2007, Plaintiff was seen by Dr. Chavez on follow-up for complaints of asthma and obstructive sleep apnea. (R. 379). Plaintiff's asthma had improved a lot, and he was questioning whether or not he needed to continue using his nebulizer at all. (R. 379).

On March 17, 2008, Dr. Pfister noted that Plaintiff complained of shortness of breath with any strenuous activities and coughing at times, as well as stiffness in the back. (R. 639).

On April 16, 2008, Dr. Chavez indicated that Plaintiff's asthma was well controlled with medications. (R. 644-45).

On April 17, 2008, Plaintiff started treating with Virgil Duvernay, M.D. (R. 679-82). Plaintiff's medical history was noted for chronic headaches, diabetes mellitus, asthma, obesity, hypertension, chronic neck pain, mastoiditis, and chronic chest pain. (R. 679). Dr. Duvernay noted that Plaintiff appeared slightly ill and morbidly obese, but he was in no apparent distress. (R. 680). On examination, the doctor noted right-sided mastoid edema with marked tenderness and left-sided mastoid prominence tenderness but without edema; decreased range of motion of the neck; decreased respiratory excursions bilaterally; diminished breath sounds to auscultation; forced expiratory wheezes; scattered rhonchi; coarse rales in the bases; 2/6 systolic murmur; and 1 to 2+ edema of the extremities. (R. 680-81). Dr. Duvernay diagnosed worsening headache, diabetes mellitus, chronic persistent asthma, obstructive sleep apnea, and cardiomyopathy. (R. 681). On May 8, 2008, Plaintiff reported increasing shortness of breath to Dr. Duvernay. (R. 673-77).

On June 3, 2008, Plaintiff was seen for follow-up with Dr. Duvernay with recurrent shortness of breath. (R. 667-71). He reported having a severe headache with a brief episode of confusion. (R. 667). His weight was 339

pounds. Dr. Duvernay's examination was essentially unchanged. (R. 668). He diagnosed COPD, cardiomyopathy, diabetes mellitus, chronic persistent asthma, and obstructive sleep apnea. (R. 669).

On September 5, 2008, Plaintiff started treating at Memorial Family Care with Karen Claise, NP. (R. 702-07). Plaintiff reported a long history of breathing problems. (R. 702). Ms. Claise observed that he appeared fatigued and took slow, deep breaths. (R. 703). His weight was recorded at 336 pounds. (R. 705). On examination, Ms. Claise noted temporomandibular joint clicking and tenderness; decreased breath sounds of the lungs bilaterally; tight air exchange; 2+ pitting edema of the lower extremities; cold left foot to the touch; neuropathy noted in the extremities with decreased sensation on monofilament testing; crepitus of the right knee with use of a cane to walk; lumbosacral tenderness; hip pain with palpation; slight edema of the right ankle; limited range of motion in the back; right shoulder pain; and numbness and tingling of the right hand and fingers. (R. 705-06). Ms. Claise diagnosed COPD; myofascial pain syndrome/temporomandibular joint disease; diabetes mellitus; hypothyroidism; hypertension with questionable congestive heart failure; chronic pain secondary to history of trauma to the back and knee; and obstructive sleep apnea. (R. 706).

On October 3, 2008, Plaintiff complained of continued significant breathing difficulties and fatigue to Ms. Claise. (R. 696-700). The examination of Plaintiff was essentially unchanged from the prior visit. (R. 698-99). It was

noted that he needed Medicaid approval before going back to Dr. Chavez. (R. 699). Plaintiff was also referred back to Dr. Ehrhard for continued myofascial pain syndrome and TMJ and to make a determination of what to do about his inability to wear his mask for treatment of sleep apnea. (R. 699-700).

Pulmonary function testing performed on October 8, 2008, revealed a severe restrictive ventilator defect; Plaintiff's FVC of 2.40 and $FEV_1$ of 1.78 were 44 percent of the predicted value. (R. 732-33, 836).

On October 23, 2008, Plaintiff returned to Dr. Chavez. (R. 917-18). He reported that he was never able to use his sleep apnea device because of problems with TMJ in his right temporomandibular joint. He also complained of a lot of asthma symptoms requiring frequent use of his medications. His weight was 349 pounds. An examination noted decreased breath sounds and mild edema around the ankles. (R. 917).

At his next visit with Ms. Claise, on December 5, 2008, Plaintiff reported worsening breathing with and without exertion. (R. 690-94). It was noted that Plaintiff had wanted oxygen in the past, but that Dr. Chavez would not prescribe it. (R. 690). An examination revealed that Plaintiff's oxygen saturation was only 87% without exercise. He also had decreased breath sounds throughout the lungs; inspiratory wheeze; bilateral rhonchi; arthritic changes of the knees, back, and shoulders; limited motion of the shoulder and knees; fair muscle strength; and slow and slightly antalgic gait. (R. 692-93). Ms. Claise noted that he needed to begin home oxygen based on his oxygen saturation levels. (R. 694).

Robert Rieti, D.O. (a colleague of Dr. Chavez) began treating Plaintiff at St. Mary's Pulmonary Care on December 16, 2008. (R. 915-16). Plaintiff reported recently starting home oxygen therapy under the care of his primary care physician. He also reported recent blood streaking in his sputum and continued inability to tolerate his nocturnal CPAP due to TMJ. Dr. Rieti diagnosed very severe obstructive sleep apnea with intolerance to CPAP, asthma, morbid obesity, and tachycardia with scant hemoptysis (coughing up blood). Dr. Rieti recommended an additional workup to rule out DVT and pulmonary embolism and indicated he would try to find a CPAP device that did not impact Plaintiff's TMJ. (R. 915).

On December 31, 2008, Plaintiff underwent a diagnostic bronchoscopy, performed by Dr. Rieti. (R. 934). The study showed a significant amount of upper airway redundant tissue, evidence of pharyngeal thrush, and findings consistent with chronic bronchitis. (R. 934).

On January 2, 2009, Plaintiff was seen for follow-up with Ms. Claise. (R. 685-89). It was noted that he started oxygen at home during both the day and night, and he felt much less fatigued using the oxygen. (R. 685). He reported that his diabetes was well controlled. (R. 685). Plaintiff had a fairly normal gait, fair muscle strength, and good range of motion. (R. 685). Examination revealed no significant changes. (R. 687-88). New lab studies were ordered, and Plaintiff was instructed to follow-up with Drs. Rieti and Bridges. (R. 688-89).

On February 17, 2009, Plaintiff visited Dr. Rieti for follow-up of his hemoptysis and reported continued difficulty using his CPAP device at night. (R. 914). It was noted that deep vein thrombosis was ruled out by diagnostic testing. Dr. Rieti diagnosed very severe obstructive sleep apnea, scant hemoptysis likely related to chronic oxygen requirement, asthma, and morbid obesity. He strongly encouraged Plaintiff to try and use his CPAP device and have physical rehabilitation to lose weight. (R. 914).

On April 3, 2009, Plaintiff reported to Ms. Claise that he was recently seen in the emergency room for shortness of breath despite continued home oxygen therapy. (R. 789-92). Plaintiff's oxygen helped greatly, but he fatigued easily. (R. 789).

On July 17, 2009, Ms. Claise completed a Medical Opinion Re: Ability to Do Work-Related Activities (Physical). (R. 766). She opined that Plaintiff could stand less than 20 minutes, walk less than ten minutes, and sit about an hour. Plaintiff could lift less than ten pounds and carry less than five pounds consistently. Plaintiff would miss work and leave early three or more days a months. He would need more than one extra break a day to lie down, and he would be distracted more than three days a month because of his impairments. (R. 766).

Dr. Rieti completed a Medical Opinion Re: Ability to Do Work-Related Activities (Physical) dated August 18, 2009. (R. 930). He opined that in an eight-hour workday, Plaintiff could stand less than 20 minutes, walk less than

ten minutes, and sit about one hour.  He also restricted Plaintiff to lift and carry less than ten pounds consistently.  Dr. Rieti opined that Plaintiff would miss work three or more times a month and need to leave work early three or more times.  Plaintiff needed more than one additional break to lie down.  Dr. Rieti reported that because of his symptoms, Plaintiff could not stay focused to complete even simple repetitive types of tasks during more than three days a month.  (R. 930).

### 2. Sleep Apnea

On October 29, 2007, Plaintiff underwent a sleep study with Robert Pope, M.D.  (R. 401-02).  The sleep study revealed complex sleep apnea syndrome and a consultation was recommended to discuss treatment options.  (R. 402).

Plaintiff saw Dr. Pope later on November 8, 2007, for consultation for his sleep apnea.  (R. 398-400).  Dr. Pope reviewed Plaintiff's October 2007 sleep study and diagnosed very severe complex sleep apnea.  (R. 398).  Plaintiff also suffered from obesity with a BMI of 41, asthma, diabetes, and possible atherosclerotic heart disease.  (R. 399).  Treatment was recommended with an adaptive pressure support servo-ventilation system ("APSSV").  Plaintiff was advised to lose weight.  It was also recommended that Plaintiff have a study done to determine if he was able to tolerate wearing the sleep mask.  (R. 399).

On November 27, 2007, Plaintiff underwent another sleep study with the use of the APSSV.  (R. 611-612).  Plaintiff did well with use of the device and his results were greatly improved.  The diagnostic impression was very severe

complex sleep apnea.  Plaintiff was advised to start using the APSSV at the default setting with a full face mask at night.  (R. 612).

On January 29, 2008, Plaintiff returned to Dr. Pope for a follow-up for his sleep apnea and use of the APSSV device.  (R. 609-10).  Plaintiff was using a new mask which he indicated fit more comfortably.  However, Plaintiff reported that he felt anxious trying to fall asleep with the device and that it made him feel like he was hyperventilating and like the machine was "blowing him up."  (R. 609).  Dr. Pope was concerned that the device was malfunctioning and noted that this particular unit was more prone to malfunction than other pressure devices.  (R. 609-10).

On March 27, 2008, Plaintiff followed up with Dr. Pope.  (R. 650-51).  Plaintiff reported that, even after his APSSV device was sent for repair, he still felt like the device was "blowing him up."  Dr. Pope noted that Plaintiff had been able to sleep for nearly six hours with a APSSV device during his sleep study.  (R. 650).

Plaintiff underwent a third sleep study with conventional bi-level pressure therapy on Apri1 21, 2008, after he claimed that he was unable to tolerate APSSV therapy.  (R. 648-49).  Dr. Pope recommended that he start treatment with the BiPAP machine at home.  (R. 649).

Robert Ehrhard, M.D., began treating Plaintiff's sleep apnea on June 3, 2008.  (R. 778-79).  He complained of pain in the right neck, hoarseness with gagging and chocking, and an inability to tolerate his BiPAP device.  (R. 778).

On examination, Dr. Ehrhard noted tenderness of the TM joints and muscles of mastication. (R. 779). He diagnosed cough, hoarseness, laryngitis, headache, myofascial pain syndrome, and obstructive sleep apnea. On August 5, 2008, Dr. Ehrhard noted no significant changes. (R. 776-77).

At his next visit, on October 27, 2008, Plaintiff reported headaches, myofascial pain syndrome, and a refusal to wear his CPAP due to his headaches. (R. 773). Dr. Ehrhard's exam continued to note tenderness of the head and jaw area. (R. 774).

On February 9, 2009, no significant changes were noted. (R. 770-71). Plaintiff was to try a mouth guard retainer for his CPAP machine. (R. 771).

On June 4, 2009, Dr. Ehrhard reported that Plaintiff had tried nasal pillows with the oral appliance, but they had caused oral sores; Plaintiff was no longer using his CPAP device. (R. 767).

### 3. Diabetes

On March 1, 2007, EMTs responded to Plaintiff's work where they found him complaining of a headache to the back of his head. (R. 270). Apparently, Plaintiff had taken insulin, but he had not eaten that day. His coworkers indicated that they had found Plaintiff unconscious on the floor. Plaintiff was transported by ambulance to Memorial Hospital. (R. 270). Testing of Plaintiff's heart, neck, and brain were all essentially normal. (R. 277-81).

Plaintiff was seen in the emergency room on November 30, 2007, for complaints of blurred vision and high blood sugars. He was diagnosed with hyperglycemia and diabetic retinopathy. (R. 445-46).

Jane Bridges, M.D., began treating Plaintiff on January 12, 2008, for management of his diabetes. (R. 599). She reported abnormal findings of obesity; palmar fibrosis bilaterally; absent dorsal pedis of the left foot; +1 dorsal pedis pulse of the right foot, +1 upper extremity reflexes; and absent knee and ankle reflexes. Dr. Bridges diagnosed type II diabetes; coronary artery disease; hypothyroidism; anxiety; diabetic retinopathy; dyslipidemia; status-post congestive heart failure; COPD; degenerative disc disease and joint disease; increased liver function tests; irritable bowel syndrome; sleep apnea; and history of pancreatitis. (R. 599).

On January 21, 2008, Plaintiff was seen for follow-up with Dr. Bridges. (R. 591). The examination was unchanged. Plaintiff was referred for diabetes education and dietary instructions. (R. 591).

On April 23, 2008, Plaintiff visited Dr. Bridges for a review of his diabetes and reported ongoing chest tightness, shortness of breath, and irritable bowel syndrome. Examination was notable for short breaths, his foot numbness was worse, and he was not sleeping well. (R. 857).

On March 31, 2009, Plaintiff was seen again for follow-up of his diabetes. (R. 856). He reported decreased energy, shortness of breath, chest pain, and

coughing.  On examination, Dr. Bridges noted shortness of breath, +1 edema of the lower extremities, and decreased breath sounds.  (R. 856).

On June 17, 2009, Plaintiff complained of swelling and numbness of the feet, as well as back pain.  (R. 855).

Dr. Bridges completed a Medical Opinion Re:  Ability to Do Work-Related Activities (Physical) on August 11, 2009.  (R. 913).  Dr. Bridges opined that Plaintiff would be able to consistently stand less than 20 minutes, walk less than ten minutes, and sit about two hours without resting.  He could lift and carry less than ten pounds on a consistent basis.  Plaintiff would be absent from work three or more times a month and would have to leave early three or more times a month.  Plaintiff needed more than one additional break to lie down during the day.  Finally, Dr. Bridges found that Plaintiff's symptoms would interfere with his ability to stay focused more than three times a month.  Dr. Bridges reported that Plaintiff suffered from severe restrictive lung disease that resulted in permanent disability.  Dr. Bridges concluded:  "This is no joke.  He is not able to work [and] no one will hire someone like Kerry."  (R. 913).

### 4.  Vision Problems

On October 12, 2007, Plaintiff was evaluated by Judy A. Englert, M.D., for complaints of poor vision related to diabetes.  (R. 312).  Plaintiff's best corrected vision was 20/20 in both eyes.  He had "very mild" diabetic retinopathy, more in the right eye than the left.  He had no evidence of macular edema and "nothing

that we needed to currently treat." Dr. Englert opined that Plaintiff should engage in good blood sugar control. (R. 312).

On February 8, 2008, Dr. Englert wrote a letter indicating that Plaintiff had suffered from some macular edema in the right eye, but after use of medication a re-examination of Plaintiff revealed 20/25 vision or better in both eyes and the macular edema had reduced. (R. 629).

### 5. Mental Health

Plaintiff underwent a consultative psychological exam on January 14, 2008, by Jessica M. Huett, Psy.D. (R. 571-74). Plaintiff denied any current or past mental health treatment, including medications. (R. 572). Plaintiff reported smoking one to three packs of cigarettes a day and drinking alcohol weekly. He helps vacuum and do the dishes, he cares for himself, he does his own shopping, he keeps appointments, and he enjoys being around people. (R. 572). On exam, Plaintiff's memory and recall were normal, affect was appropriate and mood was good, he had average intellectual functioning, and he displayed good judgment. (R. 572-73). He was assigned a GAF score of 70. (R. 574).

### 6. Other Impairments

An x-ray of Plaintiff's neck on July 3, 2008, was normal. (R. 660).

An MRI of the right shoulder dated September 16, 2008, showed prominent acromioclavicular arthropathy with undersurface spurring and tendinopathy of the supraspinatus tendon, but no cuff tear. (R. 701).

### 7. State Agency Review

J. Sands, M.D., completed a Physical Residual Functional Capacity Assessment on September 12, 2007. (R. 304-11). Dr. Sands opined that Plaintiff had no exertional limitations and no postural limitations, except he should avoid climbing ladders, ropes, or scaffolds. (R. 305-06). Plaintiff should also avoid concentrated exposures to dusts, fumes, or other allergens, as well as extreme heat or cold and humidity; Plaintiff should also avoid unprotected heights or dangerous machinery. (R. 308).

A Psychiatric Review Technique completed by Joseph A. Pressner, Ph.D., on January 31, 2008, indicated that Plaintiff was not under a severe mental disability and suffered from no mental limitations. (R. 577-88).

M. Brill, M.D., completed a Physical Residual Functional Capacity Assessment on February 19, 2008. (R. 630-37). Dr. Brill opined that Plaintiff could lift 20 pounds occasionally and ten pounds frequently and can sit, stand, and walk for six hours each of an eight-hour workday. (R. 631). Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds. (R. 632). Plaintiff should also avoid concentrated exposures to dusts, fumes, or other allergens, as well as extreme heat or cold and humidity. (R. 634).

### III. Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997). This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner. *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that he suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that

meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V. The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of July 16, 2007; Plaintiff was insured for DIB through December 31, 2012. (R. 12). The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had 14 impairments that are classified as severe: (1) severe complex sleep apnea; (2) obesity; (3) diabetes mellitus; (4) asthma; (5) chronic obstructive pulmonary disease; (6) migraine headaches; (7) gastroesophageal reflux disease; (8) hypothyroidism; (9) temporomandibular joint syndrome with myofascial pain syndrome; (10) hypertension; (11) degenerative joint disease; (12) macular degeneration; (13) cardiomyopathy; and (14) diabetic retinopathy. (R. 12). The ALJ concluded that none of these impairments met or substantially equaled any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14). The ALJ determined that Plaintiff's complaints were not fully credible. (R. 15-18). The ALJ then found that Plaintiff retained the RFC for sedentary work except he could: occasionally

climb ladders or stairs, but never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; avoid concentrated exposure to extreme cold or heat, wetness/humidity; avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, and hazards; and work with no established quota rate but rather goal-oriented. (R. 14). The ALJ determined that, based on this RFC, Plaintiff could not perform his past work. (R. 18). However, Plaintiff could perform a significant number of jobs in the regional economy, including stuffer/addresser (1,000 jobs), inspector (1,200 jobs), and surveillance system monitor (1,400 jobs). (R. 19). The ALJ, therefore, concluded that Plaintiff was not under a disability. (R. 20).

## VI.  Issues

Plaintiff has raised three issues. The issues are as follows:

1.  Whether the ALJ should have given controlling weight to Plaintiff's treating physicians.

2.  Whether the ALJ's credibility determination is patently wrong.

3.  Whether the RFC determination is supported by substantial evidence.

**Issue 1:    Whether the ALJ should have given controlling weight to Plaintiff's treating physicians.**

Plaintiff's first argument is that the ALJ should have given more weight to the opinions of Dr. Rieti, Dr. Bridges, and the nurse practitioner, Ms. Claise, rather than the opinions of state agency physicians who never examined

Plaintiff.  20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

(d)  How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2)  Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i)  Length of the treatment relationship and the frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the

source's opinion more weight than we would give it if it were from a nontreating source.

(ii)  Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3)  Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4)  Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5)  Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6)  Other factors.  When we consider how much weight to give to a medical opinion, we will also consider any factors you or

others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. § 404.1527.

In Plaintiff's case, two of his treating physicians and one treating nurse practitioner all consistently opined that Plaintiff had limitations in his ability to stand, walk, and sit that were so severe that Plaintiff could not even perform sedentary work. Furthermore, they all three consistently opined that Plaintiff would miss work, need to leave early from work, take breaks from work, and be distracted at levels that rendered him unable to perform even the least demanding of jobs. (R. 766, 913, 930).

The ALJ rejected these three opinions for several reasons, including: (1) that Plaintiff's asthma, diabetes, and other impairments were well controlled with medication; (2) that an "airway examination" performed by Dr. Rieti was within normal limits; (3) that Plaintiff was fine when he was not around fumes; (4) that Plaintiff's sleep apnea would be controlled but for his refusal to wear a mask; (5) that Plaintiff's most recent pulmonary study revealed a "FEV1 was 3.9, and for the claimant's height is not close to listing level"; (6) that Dr. Bridges provided an opinion based on Plaintiff's lung impairment, but she treats Plaintiff

for diabetes; and (7) that two state agency physicians found that Plaintiff could perform sedentary or greater work.  (R. 15-18).

The ALJ's opinion rejecting three separate, consistent opinions (two of which came from treating physicians) is problematic for several reasons.  First, the ALJ misstates the objective medical evidence.  He mistakenly stated that Plaintiff's most recent pulmonary testing revealed an $FEV_1$ of 3.9.  In reality, Plaintiff's most recent pulmonary testing revealed an $FEV_1$ of 1.78 and an FVC of 2.40, which were only 44 percent of predicted (R. 732-33, 836) and were both much closer to listing level severity than the ALJ acknowledged.  *See* 20 C.F.R Part 404, Subpart P, Appendix 1, Listing 3.02A and B.

Second, the pulmonary testing revealed that Plaintiff had a "severe restrictive ventilator defect."  Dr. Bridges, whose opinions the ALJ rejected as she was only treating Plaintiff for diabetes, had noted that Plaintiff was permanently impaired because of "restrictive lung disease."  (R. 913).  Despite the ALJ's assertion that Dr. Bridges was only treating Plaintiff for diabetes, her opinion actually is supported by the severe findings reflected in Plaintiff's most recent pulmonary testing.

Third, the ALJ based her opinions primarily on the findings of two non-examining state agency physicians.  (R. 18).  However, by the time the ALJ issued her opinion on September 28, 2009, Plaintiff's condition was much different than it had been more than a year and a half earlier when state agency physician Dr. Brill opined that Plaintiff could perform a limited range of

sedentary work (and even more different than it had been two years earlier when state agency physician Dr. Sands reviewed Plaintiff's claim). In fact, Dr. Brill specifically indicated that he based his opinion on the pulmonary study from September 2007. (R. 381). Dr. Brill's opinion was, therefore, severely outdated, and no longer indicative of Plaintiff's condition, which objective medical evidence demonstrates worsened. By the time all three opinions were rendered suggesting that Plaintiff suffered from impairments that rendered him unable to work, Plaintiff's condition was different than it had been when the state agency physicians reviewed Plaintiff's case in three other distinct ways. Plaintiff had begun to require oxygen (R. 914), he had become more obese, and medical records reveal that he had begun using a cane (R. 705-06). At the time of Dr. Brill's review, he noted that Plaintiff weighed 321 pounds, but by October 2008, Plaintiff actually weighed 349 pounds. (R. 917). Additionally, Dr. Rieti had actually noted that Plaintiff was coughing up blood, which was related to his "chronic oxygen requirement." (R. 914). The ALJ does not appear to have referenced the need for the cane or Plaintiff coughing up blood, and those new developments were also not reflected in the much earlier findings of the state agency physicians.

Fourth, the ALJ's claim that Plaintiff's breathing resolved when he was not around fumes is not reflected by the totality of the objective medical evidence. While it is true that Plaintiff suffered exacerbations in his breathing impairments in 2007 each time he attempted a return to his work around fumes, and that

there is evidence in the record that Plaintiff's breathing problems died down somewhat for a period of time in late 2007 and early 2008, the evidence (including Plaintiff's need for oxygen, as well as the significantly worse pulmonary function testing) also reveals that Plaintiff's condition worsened throughout 2008 and into 2009.

Fifth, and finally, the court notes that the ALJ found that Plaintiff should have had his sleep apnea under control if he would simply use his mask. However, the record reveals that Plaintiff made numerous attempts to wear CPAP, BiPAP, and APSSV devices to control his sleep apnea. Plaintiff was diagnosed on several occasions with temporomandibular joint syndrome, which the ALJ found to be a severe impairment, and several mentions are made in the record that this interfered with Plaintiff's ability to wear a mask. Additionally, records from Dr. Ehrhard in June 2009 actually indicate that Plaintiff developed "oral sores" from his attempt to use a CPAP device. (R. 767). The ALJ makes no reference to Dr. Ehrhard's June 2009 records. 20 C.F.R. § 416.930 does allow an ALJ to determine that a Plaintiff is not entitled to benefits because he has, for no good reason, refused to adhere to prescribed treatment that would restore that individual's ability to work. In this instance, the ALJ has not properly applied § 416.930 because she has failed to make a finding that the sleep apnea therapy would restore Plaintiff's ability to work, and she has failed to make a finding about whether or not oral sores and the TMJ amounted to a "good reason" for refusing treatment.

In conclusion, the ALJ cited numerous reasons for rejecting the opinions of two treating physicians and a treating nurse practitioner. The court cannot trace the path of the ALJ's reasoning for rejecting these three consistent opinions. This case must be remanded for a new analysis of these three opinions that does not rely on outdated opinions from state agency physicians. The ALJ must also properly state all of the objective medical evidence, including Plaintiff's most recent pulmonary studies. Finally, the ALJ must make a specific finding in accordance with 20 C.F.R. § 416.930 about Plaintiff's supposed refusal to adhere to prescribed treatment.[1]

**Issue 2:      Whether the ALJ's credibility determination is patently wrong.**

While remand is already necessary to re-evaluate the opinions of treating sources, the court wishes to emphasize that the ALJ must utilize SSR 96-7p, as well as all seven factors listed in 20 C.F.R. § 404.1529(c)(3)(i)-(vii) to determine whether or not Plaintiff's allegations are fully credible. The Seventh Circuit, in a number of recent cases, has lamented the fact that ALJs routinely use boilerplate language and find an individual not fully credible without making specific findings about which statements are and which are not credible and why. *See Martinez v. Astrue,* 630 F.3d 693 (7th Cir. 2011); *Spiva v. Astrue,* 628 F.3d 346 (7th Cir. 2010); *Parker v. Astrue,* 597 F.3d 920 (7th Cir. 2010). We

---

[1]Because the court has now determined that remand is necessary for other reasons, we need not address Plaintiff's arguments concerning the ALJ's RFC determination in Issue 3. On remand, the ALJ must issue a new decision and will be required to make a new RFC determination at step five, making sure to include the limitations resulting from the combination of all 14 of Plaintiff's severe impairments.

recognize that the job of an ALJ is very difficult and her caseload extremely heavy. However, any credibility determination must at least adhere to the requirements outlined in these recent Seventh Circuit cases.

## VII. Conclusion

The court cannot trace the path of the ALJ's reasoning concerning her failure to give controlling weight to Plaintiff's treating physicians. The decision of the Commissioner of the Social Security Administration is **REMANDED.** On remand, the ALJ will be required to make a new credibility determination as discussed above and must make a new RFC determination at step five making sure to include limitations resulting from the combination of all 14 of Plaintiff's severe impairments.

**SO ORDERED** the 17th day of May, 2011.

William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Eddy Pierre Pierre
LAW OFFICES OF HARRY J. BINDER
  AND CHARLES E. BINDER, P.C.
fedcourt@binderandbinder.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov